**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA

v.                                       No.  4:06CR00082 JLH

HAROLD JEROME KELLEY and
JACKIE E. PORCHAY

**AMENDED AND SUBSTITUTED
OPINION AND ORDER**

Harold Jerome Kelley and Jackie E. Porchay have been indicted for conspiring to distribute cocaine hydrochloride and for money laundering.  The indictment stems from a traffic stop in Texas during which policemen found crack cocaine, a crack pipe, and more than $200,000 in cash in a car owned by Porchay, driven by Kelley, and occupied by one passenger in addition to Kelley.  Law enforcement personnel subsequently searched a residence shared by Kelley and Porchay.  Kelley filed a motion to suppress the evidence that resulted from the traffic stop, while Porchay filed motions to suppress the evidence that was seized during the search of her residence.  In addition, both Kelley and Porchay also filed motions for bills of particulars.  The Court held an evidentiary hearing on Kelley's motion to suppress.  The Court denied the motions, and Porchay filed a motion to reconsider as to certain issues.  The Court held an evidentiary hearing on Porchay's motion.  For the following reasons, all of the defendants' motions are denied.

**I.**

**A.    The Traffic Stop**

At approximately 7:45 in the morning of February 15, 2006, Corporal Cary Barnett, a highway patrolman in Texas, stopped a white 2001 Chevrolet Monte Carlo that he had seen speeding westbound toward Dallas on Interstate 30.  Kelley was driving the car, which was owned by Porchay.

Kelley was accompanied by Teresa Speed.

Barnett has been employed for more than eleven years with the Texas Department of Public Safety in the Highway Patrol Division at its office in Sulphur Springs, Texas. During his tenure with the highway patrol, Barnett has made thousands of traffic stops. According to Barnett, the average traffic stop lasts approximately fifteen minutes. Barnett testified that Dallas is a known drug activity area for drug couriers. He testified that drug couriers commonly travel west through Sulphur Springs on I-30 with money to purchase drugs in Dallas.

A video camera on Barnett's patrol car recorded the stop. According to the clock on the video camera, the stop began at 8:39.[1] As Barnett pulled the vehicle over, he noticed unusual movement by the occupants of the vehicle. They appeared to be reaching in the back seat and perhaps under the seat. Barnett exited his patrol car, approached the vehicle from the passenger's side, identified himself, and explained the reason for the stop. Barnett then told Kelley, the driver of the vehicle, to exit the vehicle and move to the grass beyond the highway's shoulder so that they could communicate better.

When Kelley was outside, Barnett asked him for his driver's license and proof of liability insurance. Barnett examined Kelley's driver's license and insurance card and then questioned him. Barnett asked Kelley what he did for a living. Kelley responded that he delivered produce in Conway for his uncle's business. Barnett asked Kelley where he had come from and where he was going. Kelley responded that he had come from Little Rock and was going to visit Fred Coleman and his wife Dominique Coleman.

---

[1] Barnett testified that the video camera clock did not show the correct time. The time stamp recorded on the videotape is therefore relevant to show the duration of the stop and not to the actual time of the stop.

At that point Kelley started to appear abnormally nervous. Barnett continued to question Kelley, asking him the Colemans' street address. Kelley responded that, while the Colemans lived in Mesquite, Texas, he did not know their street address. Barnett then walked over to speak to Speed. Barnett asked her the same question about their destination. She responded that they were going to visit two of her friends, Karen and Carolyn. When Barnett asked where her friends lived, Speed became nervous and defensive and would not answer. Barnett asked her several times who she was. Speed repeatedly refused to identify herself.

Barnett returned to Kelley at 8:43, according to the video camera's clock, and asked Kelley if the vehicle belonged to him. Kelley answered that it belonged to his girlfriend. Barnett asked Kelley if his passenger was his girlfriend. Kelley responded that the passenger was the mother of his baby, not his girlfriend. Barnett asked Kelley if he had ever been arrested for anything. Kelley responded that he had been arrested for a controlled substance offense. Barnett went to his patrol car and ran a check on Kelley's criminal history. At 8:47, the check return revealed that Kelley had been arrested for a controlled substance offense and evading arrest.

Barnett returned to where Kelley was standing and asked Kelley several times if he had anything illegal in the vehicle. Each time, Kelley turned his head to avoid eye contact with Barnett before responding that he did not. Barnett asked Kelley if he would consent to a search of his vehicle. Kelley responded that he would not consent. Barnett then decided to request a canine patrol unit to sniff Kelley's vehicle. Barnett called for a canine unit at approximately 8:50. At approximately 8:52, Barnett was told that a canine patrol unit had been dispatched to his location and would arrive in 25 to 30 minutes. The canine unit was approximately 37 miles away from the location of the stop.

While waiting for the canine patrol unit to arrive, Barnett again questioned Kelley and Speed about where they were going, and he recorded their answers. Barnett then asked Kelley what he had in his front pants pocket. Kelley pulled out a large roll of cash, which was later determined to be $1,720. Barnett asked Kelley why he was carrying so much money in his pocket. Kelley replied that they were going shopping for clothes and Valentine's Day presents. Barnett observed that Kelley was becoming more nervous. Kelley was constantly moving his hands and feet, fidgeting, rubbing and scratching himself, excessively swallowing and spitting, giving uncooperative or vague answers to Barnett's questions, and attempting to evade questions. Barnett asked Kelley several times about the name of Kelley's passenger, but Kelley refused to cooperate. Eventually, Speed relented and gave Barnett her name.

At 9:22, Trooper Jason Edward Graham arrived with the drug dog. After briefly conferring with Graham, Barnett had Speed exit the vehicle while Graham walked the drug dog around the vehicle at 9:25. The dog alerted on the right passenger side of the vehicle at 9:26. The troopers then handcuffed Kelley and searched the vehicle. They found, among other things, a crack pipe and crack cocaine in Speed's purse; $2,600 inside the car's center console, and approximately $206,000 in three separate plastic bags inside the trunk.

**B.     Search of the Residence**

On April 19, 2006, FBI Special Agent James Woodie applied for a search warrant to search 10005 Bradley Drive, Little Rock, Arkansas, for evidence of a drug conspiracy and money laundering. Porchay and Kelley live at that address.

Based on the information presented in the warrant affidavit, the Honorable Jerry W. Cavaneau, United States Magistrate Judge for the Eastern District of Arkansas, issued a search

warrant. Among the items searched and seized at 10005 Bradley Drive were a 2000 Honda Accord located in the garage and a Suzuki motorcycle in the front yard.

## II.

### A.     Kelley's Motion to Suppress

Kelley asks the Court to suppress all evidence seized as a result of the search and seizure on February 15, 2006. Kelley does not contest the validity of the initial traffic stop. Rather, he argues he was detained for an unreasonable amount of time and without reasonable suspicion. He also argues that the officers lacked probable cause to search the vehicle. A detention may become a de facto arrest in violation of the Fourth Amendment if it continues for an unreasonably long time; however, there is no rigid time limit as to the length of an investigatory detention. *United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605 (1985). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quoting *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994)). "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id*.

Barnett undoubtedly had probable cause to stop Kelley, who was speeding. *United States v. Lyton*, 161 F.3d 1168, 1170 (8th Cir. 1998) ("[A]ny traffic violation, even a minor one, gives an officer probable cause to stop the violator."). When an officer has probable cause to stop a vehicle, he may ask questions of the vehicle's occupants reasonably related to the stop, including questions relating to their destination, route, and purpose; questions of the driver about the identity of his passengers; and questions of the passengers to verify the information provided by the driver. *United*

5

*States v. Edmisten*, 208 F.3d 693, 694 (8th Cir. 2000); *United States v. Munroe*, 143 F.3d 1113, 1116 (8th Cir. 1998).  Barnett's questions were proper.

The answers that Barnett received from Kelley and Speed, combined with their suspicious behavior, justified the expansion of the scope of the stop beyond what was justified for a traffic violation.  If during a traffic stop, an officer develops a reasonable, articulable suspicion that criminal activity is afoot, he has justification for a greater intrusion unrelated to the traffic offense.  *Sanchez*, 417 F.3d at 975; *see also United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993) ("[I]f the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.").  Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at "the totality of the circumstances, in light of the officer's experience." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997).  "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed together." *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002).

At the time of the stop, Barnett had more than eleven years of experience with the highway patrol.  He also had received training in kinesics, which is the interpretation of non-verbal behavior related to movement.  As Barnett pulled the vehicle over, he noticed unusual movement by the occupants of the vehicle, who appeared to be reaching in the backseat and perhaps under the seat. When Barnett asked Kelley where he was going, Kelley became unusually nervous.  He told Barnett that he was going to visit Fred and Dominique Coleman.  However, Kelley did not know the Colemans' street address.  When Barnett asked Speed where they were going, Speed became unusually nervous as well.  She told Barnett that they were going to visit her friends Karen and

Carolyn, after which she became defensive and refused to answer anymore of Barnett's questions. Speed was unusually reluctant to identify herself. The inconsistent answers that Speed and Kelley gave Barnett, combined with their nervousness and unusual behavior, justified Barnett's expansion of the scope of the stop to investigate further. *Cf. Edmisten*, 208 F.3d at 694; *Lyton*, 161 F.3d at 1170.

A criminal history check of Kelley revealed that he had a controlled substance arrest and one for evading arrest. Kelley was traveling in a vehicle that was neither his nor his passenger's, which is a common practice among drug couriers. Kelley appeared nervous and evasive when Barnett asked him several times whether he had illegal narcotics inside the vehicle; he turned his head and would not make eye contact with Barnett when he responded. After Barnett asked Kelley what he had in the front pocket of his pants, Kelley revealed a large roll of cash. Kelley provided no credible explanation as to why he was carrying so much cash on his person. Barnett took note of the ways that Kelley appeared to become more nervous, such as the constant movement of Kelley's hands and feet, his fidgeting, and his attempts to evade questions. At this point, Kelley's nervous behavior, the conflicting accounts of where he and Speed were headed, Speed's reluctance to identify herself, Kelley's criminal history, and Kelley's inability to explain his possession of a substantial amount of cash on his person, created a reasonable suspicion that Kelley was engaged in illegal activity. *Cf. United States v. Ehrmann*, 421 F.3d 774, 781 (8th Cir. 2005) (fidgeting and nervousness); *Sanchez*, 417 F.3d at 973, 975-76 (nervous behavior, inability to provide exact destination of trip, and conflicting stories); *United States v. Fuse*, 391 F.3d 924, 930 (8th Cir. 2004) (unusual nervousness and criminal history); *United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001) (extreme nervousness and contradictory reasons for travel). Barnett therefore had reason to detain Kelley until

his suspicion was either confirmed or dispelled.

As for the length of the detention, the Court must take into account "whether the police diligently pursue[d] their investigation." *Sharpe*, 470 U.S. at 685, 105 S. Ct. at 1575. An important factor to consider in determining the diligence of an investigation is whether any delay is caused by the distance that must be traveled to bring the closest available drug dog. *See United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994). As the Eighth Circuit has observed,

> When police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times. Courts must consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.

*Bloomfield*, 40 F.3d at 917 (internal quotation marks omitted). Here, Barnett called for a canine unit as soon as he suspected that Kelley was transporting illegal drugs. Only 13 minutes had elapsed from the beginning of the stop until Barnett called for the canine unit—less than the 15-minute average for a traffic stop. Of the remaining 34 minutes of the stop, 30 minutes were taken up waiting for the arrival of the drug dog. There is no evidence that Graham was dilatory in traveling to the location of the stop, which was 37 miles from his location, or that there was any unreasonable delay in employing the drug dog. Barnett's 47-minute detention of Kelley during the traffic stop was reasonable under the circumstances and did not violate Kelley's Fourth Amendment rights.

Kelley argues, however, that the 47-minute stop was more than a de minimis intrusion and therefore unreasonable under the Fourth Amendment. Kelley's argument might be correct in a case where the only justification for prolonging the stop is a traffic violation. *See Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 837, 160 L. Ed. 2d 842 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond

the time reasonably required to complete that mission."); *see also United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006). But this case involves a stop that was lawfully expanded in scope due to Barnett's reasonable suspicion that criminal activity was afoot. Where an officer has reasonable suspicion of criminal activity such that he may lawfully expand the scope of the stop, the Eighth Circuit has found detentions of up to three hours reasonable. *Cf. Sanchez*, 417 F.3d at 975 ("A total duration of approximately forty-five minutes is certainly not unreasonable . . . ."); *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) (finding detention of nearly three hours while waiting for the arrival of a drug dog reasonable); *White*, 42 F.3d at 460 ("The wait of about one hour and twenty minutes pending arrival of the drug dog was a reasonable period to detain the truck."); *Bloomfield*, 40 F.3d at 917 ("The one-hour period . . . was not an unreasonable period to wait for a drug dog to verify [the officer's] suspicion."). The length of the stop in this case is well within the bounds of reasonableness as determined by the Eighth Circuit.

Kelley argues that the Government did not establish that the dog was "certified, qualified, and reliable." To the contrary, Trooper Graham testified that he and the dog were certified as a team for cocaine, marijuana, heroin, and methamphetamines. He testified that the dog had proven to be 100% reliable over one and one-half years. He testified that he performs approximately 165 searches per year. Kelley cites no authority for the proposition that such experience is inadequate.

After the drug dog alerted, the troopers had probable cause to arrest Kelley and search the vehicle. *Sanchez*, 417 F.3d at 976. When the troopers discovered crack cocaine and drug paraphernalia in the passenger compartment, as well as a substantial amount of cash in the console, they had probable cause to search the trunk. *Cf. United States v. Riedesel*, 987 F.2d 1383, 1390 (8th Cir. 1993) (holding that the "commonsense conclusion" was the officers had probable cause to

search the trunk of the defendant's automobile where they legally discovered controlled substances in the passenger compartment). Because the stop of Kelley and the subsequent search of his vehicle did not violate the Fourth Amendment, Kelley's motion to suppress is denied.

**B.     Porchay's Motions to Suppress**

Porchay asks this Court to suppress all the evidence and statements obtained as a result of the search of 10005 Bradley Drive. In her first motion to suppress, Porchay argues that the search warrant was not supported by probable cause. A search warrant must be supported by probable cause. U.S. CONST. amend IV. "Probable cause to issue a search-warrant exists when the supporting affidavit sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Lakoskey*, 462 F.3d 965, 977 (8th Cir. 2006). "A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331, 76 L. Ed. 2d 527 (1983) (internal quotation marks omitted).

Here, the magistrate properly relied on Woodie's affidavit in finding that probable cause existed to search 10005 Bradley Drive for evidence of a conspiracy to distribute illegal drugs and money laundering. Woodie wrote in the affidavit that he had been an FBI agent since 2000 and that he had extensive experience relating to narcotics investigation.[2] He wrote that, from his experience, persons involved in large-scale drug trafficking often conceal in their residences caches of drugs,

---

[2] Porchay argues that Woodie misrepresented his experience by failing to disclose that part of his experience was obtained before 2000 when he worked as a paraprofessional in the asset forfeiture section and by failing to disclose that he worked in the anti-terrorism section of the FBI for three of his years as an agent. Porchay does not point to any statement in the affidavit regarding Woodie's experience that is false. Had Woodie stated further details, including his experience as a paraprofessional before he became an agent and including his three years on the anti-terrorism force, the affidavit still would have stated probable cause for the search.

large amounts of currency, and other items relating to drug transactions and the financial proceeds of those transactions. He wrote that drug traffickers purchase assets such as vehicles and real property using drug proceeds in the name of other individuals to conceal the true ownership of such assets. He also wrote that it was his experience that drug traffickers commonly maintain firearms and records of drug transactions at their residences.

The affidavit related the events of the February 15 traffic stop in which the affidavit described, based on Kelley's own statements and cooperation after the traffic stop, Kelley's involvement in a criminal conspiracy to distribute drugs. Kelley's role in the conspiracy was to drive to Dallas where he would pick up cocaine and transport the cocaine back to Little Rock for distribution. Kelley in fact consented to make recorded calls after the traffic stop. In those calls, he made arrangements to pick up cocaine in the Dallas area, and then he met persons, as arranged, to consummate the transactions while under the observation of law enforcement officers. Woodie personally interviewed Fred Coleman, whom Kelley had identified as a participant in the conspiracy, and his wife Dominque Coleman. The Colemans confirmed Kelley's involvement in the drug conspiracy, while Fred Coleman also stated that he had seen numerous firearms in Kelley's residence.

Woodie included in the affidavit information that he had gathered from public records. The records showed that Kelley had "a lengthy history of arrests and convictions," including a conviction for conspiracy to distribute cocaine. Arkansas State Police records showed that a Jackie Porchay who resided at 10005 Bradley Drive had a concealed handgun permit. Kelley's driver's license and Porchay's income tax information listed 10005 Bradley Drive as their residence. Property records showed that Porchay had bought a recently constructed home in a new subdivision in Benton for

11

$118,000. She also owned a 2000 Honda Accord, a 2001 Chevrolet Monte Carlo, a 2004 Cadillac Escalade, and a Suzuki motorcycle, Model GSR. She had not filed an income tax return for 2005. Her reported income for 2003 and 2004 was $13,274 and $13,263 respectively.

In support of her argument that no probable cause existed, Porchay cites *United States v. Schultz*, 14 F.3d 1093, 1097-98 (6th Cir. 1994), where the court found that probable cause did not exist to search a safety deposit box because there was no connection in the warrant affidavit between the defendant's illegal drug sales and the safety deposit boxes that were searched. The court in *Schultze* stated that, while an officer's training and experience may be considered in determining probable cause, it cannot substitute for the lack of an evidentiary connection between the criminal activity and the place to be searched. *Id.* at 1097. All of the evidence in *Schultze* suggested that the drug sales occurred in the defendant's apartment; no evidence suggested that anything would be found in the safety deposit boxes relating to the drug sales. *Id.*

In this case, however, there was reason to believe that evidence relating to a criminal conspiracy and money laundering would be found at 10005 Bradley Drive. Kelley was implicated in a criminal conspiracy by virtue of the traffic stop in Texas and his own statements. Woodie's affidavit stated that Kelley would drive from Little Rock to Dallas with large amounts of cash and return to Little Rock with the cocaine. The traffic stop showed that he would use a car that was owned by or titled in the name of Porchay. Porchay and Kelley lived together at 10005 Bradley Drive. Public records did not show that Kelley owned property or that he reported income to the State of Arkansas during the years 2003, 2004, and 2005. Porchay reported a small income but owned substantial property. Even if she financed her acquisitions, rather than paying cash, Porchay's

reported income[3] was inadequate to allow her to purchase the property that she reportedly owned. Coleman had seen firearms "in Kelley's residence." Coleman did not say that he had been to 10005 Bradley Drive or seen guns there. The record is unclear as to whether Coleman's comment referred to 10005 Bradley Drive or some other location. Evidence clearly shows that Kelley resided at 10005 Bradley Drive. Porchay argues that Kelley also resided elsewhere, but she offered no evidence of the location of his alternate residence or that Coleman referred to it when he said that he had seen firearms "in Kelley's residence." Coleman told Woodie that Kelley had a 2001 Chevrolet Monte Carlo modified to contain compartments specifically designed to conceal narcotics, for the purpose of transporting narcotics from Texas to Arkansas for distribution. When Kelley was stopped on February 15, 2006, he was driving a 2001 Chevrolet Monte Carlo registered to Jackie Porchay at 10005 Bradley Drive. He was en route to Dallas to purchase cocaine. Judge Cavaneau could have legitimately drawn the "practical, commonsense" conclusion that evidence of a criminal conspiracy to distribute drugs and money laundering of Kelley and Porchay could be found at 10005 Bradley Drive, the address where Kelley and Porchay lived together and where this 2001 Chevrolet Monte Carlo was registered. *Cf. United States v. Macklin*, 902 F.2d 1320, 1325 (8th Cir. 1990) (a probable cause affidavit is to be viewed "with an eye toward a commonsense determination").

Moreover, regardless of whether probable cause to search the residence existed or not, the good faith exception justifies the search here. "When a search is conducted pursuant to a warrant, the good faith exception to the exclusionary rule applies, and evidence should not be suppressed due to an absence of probable cause unless the warrant was based on an affidavit 'so lacking in indicia

---

[3] Porchay's motion states that she had income not disclosed in Woodie's affidavit, but she offered no proof of the amount of any unreported income nor any reason why that income was not disclosed on her income tax returns submitted for the State of Arkansas.

of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 923, 104 S. Ct. 3405, 3421, 82 L. Ed. 2d 677 (1984)). The Court is convinced that Woodie did not give a knowingly false affidavit or otherwise act in bad faith. *Cf. Schultze*, 14 F.3d at 1098. The affidavit was issued by a proper authority, and there is no evidence that the issuing magistrate had abandoned his neutral judicial role. *Cf. id*. As has been explained above, the affidavit "related the results of an extensive investigation" and, at a minimum, "provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." *United States v. Skorniak*, 59 F.3d 750, 754 (8th Cir. 1995) (quoting *Leon*, 468 U.S. at 926, 104 S. Ct. at 3422). It was therefore objectively reasonable for the agents to rely on the issuance of a warrant to search 10005 Bradley Drive for evidence of a criminal conspiracy to distribute drugs and money laundering.

In her second motion to suppress, Porchay argues that the Government illegally searched the 2000 Honda Accord located in the garage of 10005 Bradley Drive and the Suzuki motorcycle in the front yard because the garage and the yard were not identified as places to be searched in the warrant. She also argues that the Government illegally seized those vehicles because they were not listed on the search warrant as items to be seized. The search warrant affidavit sought to search the premises of 10005 Bradley Drive. "[A] Vehicle found on a premises (except, for example, the vehicle of a guest or other caller) is considered to be included within the scope of a warrant authorizing a search of that premises." *United States v. Pennington*, 287 F.3d 739, 745 (8th Cir. 2002). Because both vehicles were on the premises and owned by Porchay, they were validly searched. The vehicles were lawfully seized under the provision of the search warrant that authorized the seizure of "any and all other material evidence" of money laundering. Because of the paucity of Porchay's reported income,

the agents had reason to believe that the vehicles were purchased from the proceeds of illegal activity. The category of any material evidence of money laundering was sufficiently specific to meet the Fourth Amendment's particularity requirement because it "call[ed] for the seizure of property involved in a defendant's commission of crimes." *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001); *see also United States v. Conley*, 4 F.3d 1200, 1208 (3d Cir. 1993) (finding warrant sufficiently specific to satisfy particularity where it limited the seizure of items to things that were "related to" illegal gambling operation). The search and seizure of the vehicles did not violate the Fourth Amendment. Porchay's motions to suppress are therefore denied.

### III.

Porchay also contends that the Government violated Federal Rule of Criminal Procedure 41(f)(2) by not listing the vehicles in the record of items seized left by the agents after the search. "Non-constitutional [ministerial] violations of Rule 41 warrant suppression only when the defendant is prejudiced by the violation, or when there is evidence of intentional and deliberate disregard of a provision in the Rule." *United States v. Simons*, 206 F.3d 392, 403 (4th Cir. 2000) (citations and quotation omitted). Woodie testified that he called Porchay and invited her to come and secure her property, but she declined. He testified that he did not leave a receipt because no one was home. He also testified that the failure to list the motorcycle and the automobile on the inventory was accidental. Porchay argues that Woodie's testimony is implausible, but the Court finds no reason that would have caused Woodie deliberately to omit those two items from the inventory. From Woodie's demeanor while testifying, the Court finds that Woodie told the truth when he said that the omission was accidental. Porchay's mother testified that Porchay was distressed by not knowing the location of the motorcycle and the automobile, and the Court believes that she was. However,

the Court is not convinced that this distress is sufficient prejudice to require that the items be returned or that the evidence be suppressed.

### IV.

Both defendants have moved for a bill of particulars from the Government. "The purpose of a bill of particulars is to inform the defendant of the nature of the charges against him and to prevent or minimize the element of surprise at trial." *United States v. Little*, 562 F.2d 578, 581 (8th Cir. 1977) (quoting *United States v. Miller*, 543 F.3d 1221, 1224 (8th Cir. 1976)). While the second superseding indictment does not provide by itself sufficient information to prevent or minimize the element of surprise at trial, the attorney for the Government in this case has told the Court that the Government has an open-file policy with regard to both defendants. A bill of particulars is not required when information necessary for a defendant's defense can be obtained through some other satisfactory form, such as where the Government has an open-file policy or has otherwise disclosed the information to the defendant. *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991); *see also United States v. Urban*, 404 F.3d 754, 771-72 (3d Cir. 2005); *United States v. Barnes*, 158 F.3d 662, 665-66 (2d Cir. 1998); *United States v. Stephenson*, 924 F.2d 753, 761-62 (8th Cir. 1991). Because it appears that the Government has and will provide the information the defendants need through some other satisfactory form, the Court denies defendants' motions for bills of particulars as moot.

### CONCLUSION

For the reasons stated, Kelley's motion to suppress and motion for a bill of particulars are DENIED. Documents #72, #78. Kelley's motion for immediate order is DENIED AS MOOT. Document #132. Kelley's motion for reconsideration of the magistrate's order to revoke bond is

DENIED for the reasons stated on the record at the hearing on October 4, 2006. Document #85. Porchay's motion for a bill of particulars and motions to suppress are DENIED. Documents #106, #119. Porchay's motion for reconsideration is DENIED. Document #136.

IT IS SO ORDERED this 18th day of January, 2007.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE